Marriage of Jennifer Loeb, Petitioner of countries Fontaine Collier, John Loeb, Respondent of the unconstitutional appealing, and Priority of Tribal Equality Law Foundation president and law responder Mr Robert E Black dea? All the JURIES Good morning Counsel Mr Black Good morning Your Honors May it please the Court Counsel and in my last 15 min. I will attempt to present the arguments on behalf of both Your Honors. The way that summary judgment was presented in the trial court was that premised upon the Romano decision which itself arises out of the Johnson decision of the Supreme Court. That because an owner has an absolute right according to Johnson to dispose of property in any manner that he sees fit. That because or if the property disposition met a proper estate planning plan as it were. And if there was no counter affidavit to contest the estate planning plan itself. Then that is sufficient. Game over. And that is what the trial court adopted and accepted. Well didn't the affidavit need to be the affidavit of an expert to counter the affidavit that was filed in conjunction with the motion for summary judgment? And why wouldn't that fact alone, the absence of one here, justify the trial court's entry of summary judgment for the husband? Because it is our position that this goes beyond that. Because this was an estate planning plan that was supposed to belong to two parties. And to the property interests belonging to two parties. And what the attachments to the motion for summary judgment show us is that the attorneys were saying we were hired to make an estate planning plan for two parties. For this couple. And this is what we were doing. Contrary to those affidavits of the attorneys. We have deposition testimony in the record that said I never met with Mrs. LaRock. I never saw Mrs. LaRock until the funeral of their son in 2014. But we were both saying the same thing. She signed the requisite legal documents. Mr. Black, wouldn't it be a little different if these trust plans weren't made so far prior to the breakdown of the marriage? It would be. However, some of these trust plans were created back in 2005. Six years before. Right. And some of them were also being done in 2012. What do you mean in 2012? There were still the loans and some trust creations going on at that time. So yes, it was an ongoing kind of estate planning thing. And he paid all the loans back. Yes, he did. Yes, he did. As far as everything that we saw with interest. And everything was documented. As far as the record shows, yes. So you're not contesting the legality of the trust that were set up. Is that correct? Okay. What Romano dealt with was a business interest. The father had shares in a company that went to his son. And it was gifted to the son. The son then had some of those shares go across to his siblings. The wife argued, wait a minute, this should be part of our marital property. This should be part of my marital interest. That doing this was an end around, so to speak. That it was a sham. That it was a fraud. Now, our position is, there are certain ways that you can show what is illusory, what is a sham, what is colorable, what is a fraud. One of those ways, obviously, is what the court found in Frederick. That, you know, it was done a couple months before you were filing for divorce. The agreement was a sham. Everything there was a sham. One of those could be what they attempted to show in Romano. That there were certain ties to the documents, to the estate planning documents, that didn't make sense. Another of those ways could be that this, you know, this was, what was purporting to be in the estate planning plan for both parties, was not. Isn't it a little different, isn't Romano, can't you distinguish Romano from the case of him? Romano, it was some extended family members on his side. Correct. That were getting the monies here, who was benefiting from this trust. Right, and that's exactly right. Romano was in an extended family situation. Right. This is money coming directly into the marriage. That's a huge distinguishing factor. Well, and in Romano, the court upheld the trial court's finding that there was no fraud against her marital interests. Correct. So, doesn't that weigh strongly against Janet's arguments here? I don't believe so, Your Honor, for a couple of reasons. Because that did exist, again, we have that huge distinguishing factor that that was outside the marriage. Came from outside the family. Whereas there is no dispute here, but the money came directly into the marriage. Which is going to benefit their bio children. Yes. Yes. As opposed to his brothers and sisters, as it was in Romano. That is correct. You're arguing that these trusts were a sham, which I guess is the vernacular for culpable or a loser. But the sham that you're arguing was that she didn't bother to inform herself before she signed these documents? What's the sham? We're arguing that a genuine issue of material fact was presented to prevent the entry of summary judgment. That she actively and knowingly participated in this estate planning plan to do all of these things. Because she didn't participate with the attorneys. The attorneys did not consult with her. I'm not sure how that would defeat summary judgment here. But I guess I had a question about the difference between depletion and dissipation. Yes. Can you elaborate about the difference here? Because the husband conceded a certain amount of money, a couple hundred thousand dollars was dissipation. The trial court took that into effect. Right. Explain, please, the difference then in what you're arguing with regard to depletion. That all dovetails into the date that the court found the irreconcilable breakdown, irrevocable breakdown of the marriage. The husband conceded that after February 1, 2014, which is the date that the trial court found to be the breakdown of the marriage. That it started at that time. Yeah. That that was the money that he had dissipated. Our argument in terms of depletion was that there were, under 503D1, before what the court ruled as an irreconcilable breakdown here, that there was still spending going on that took money out of the property interest that would belong to Janet. That is essentially the argument. There was still spending going on. Yes. What do you mean spending? I mean, if somebody went out to dinner and routinely, you know, had a lavish dinner. I understand, Your Honor. Can you focus a little bit, focus us a little more, please? Okay. The depletion argument is somewhat, well, it's certainly not as concrete in Illinois as dissipation. Certainly. It is something that was raised in the trial court. It is something that we put forth in our appellate brief. Excuse me. My mouth is getting dry all of a sudden. Go ahead. Let's take your time. Can I grab some water? No problem. It was raised in our brief. We cited the Norris case, the new ring marriage of Lee case. What were those propositions? No, those two cases, though, Mr. Black. Yes. You could distinguish him with Ray, the marriage of Norris. That was, I mean, that was, he was, had a woman that he was giving a lot of money to, correct? I mean, do we have that in this case? Do we have proof of that in this case? No proof. Okay. And then in Ray, the marriage of Lee, that was, he was transferring larger sums prior to the marriage, correct? If I can just add, that was dissipation, not depletion in that case. Right. Your Honor, I'm not going to stand up here and say that depletion is going to be our soundest and strongest argument. Well, what is your argument for depletion? What's the depletion? Our argument for depletion is that because the trial court looked at all of the factors here, looked at the fact that these things were ongoing during 2012 and 2013. What was ongoing? That both parties were consulting with lawyers in 2012. That both parties retained lawyers in 2013. Then they went to Mexico in 2014. Yes, they did. And didn't the court kind of found that as the breaking point? Well, like they finally realized, oh, we're not going to be able to deal with this. The court found independently that this was the breaking point. We submit that that is not consistent with the court's finding that in August of 2013, that it accepted John's testimony that he went and told Janet and the rest of the family, I can't take this marriage anymore. I'm done. I'm moving out. I'm done. But he didn't move out then? He did not. So your position then is in 2014 when they went to Mexico, they went to Mexico to discuss dividing the property? The testimony was that, as in any case, the testimony is conflicting. Janet's testimony was that they went to discuss an amicable resolution to their marriage. That she had discovered that John was engaging in an affair, and they went to discuss how to resolve things. Don't the exchange of text messages which were admitted here militate against finding that the marriage had broken down earlier than the date the trial court said it had started to irreconcilably break down? I have two responses to that, Your Honor. Number one, I think that ongoing text responses to a couple that's still communicating about their children or otherwise talking about things doesn't necessarily mean that it means that the marriage is still ongoing. But number two, as we indicated here, there's a big problem, an evidentiary problem, with the admission of those text messages. And what do you think is this evidentiary issue? That would be foundationally the authentication there. We did cite the case, and that's the Tremna case, that talked about, in terms of text messages, you need to show authentication, which is to demonstrate the document is what it purports to be. And what Tremna talked about is that you need to show that it mirrored the phone company records. There's been a couple other cases after that, including one in 2017. These are all criminal cases. This case is the Harvard case. There's another case called Watkins. Watkins, again, said you need authenticated telephone company records. And Harper said that text messages are not admissible as a business exception to your signal. Here in this case, we have one of the parties who testified that this was the text message that he sent to his wife, and he recognized it as having been sent by himself and a number of these, the whole list of text messages that were produced, and that the content of the text messages was consistent with what he had written. Why is that not a sufficient foundation under the Illinois Rules of Evidence? Because there still was the lack of authentication from the company that was holding onto these records. There's still that lack of authentication of where they came from, how they were held onto, how in the ordinary course of business they were directed, how are they held onto within the iCloud, all of these types of things that surround how this is done, it still is not authenticated in that fashion. I think you're conflating authentication and foundation. I mean, with authentication, this case is more like downing, is it not? This case is more like the downing case than the cases that you're citing, where it was authenticated by the nature of the give and take of the conversation itself and the fact that the husband, in this case, said that he recognized these. I mean, he didn't recognize every one of them, but he said this is the way we talked, and he recognized some of them. Okay. Also, Mr. Berger had cited a chromic case, which was a text message case. How do you distinguish that case? Because I think the facts of this case are a lot like that. I still think we are missing the authentication from the telephone company, that this, in the ordinary course of business, this is how these are kept, this is how they are kept in the iCloud, some sort of record-keeping format there. That's what's missing. Okay. I know that my time is up, and I haven't even touched upon the other appellant's argument. I'm sorry, counsel. We're forewarned. I understand. I don't want to tell this to you, but we have three cases today. I understand. Pretty much. I'll schedule. You'll have time. Thank you, Your Honors. Mr. Berger? All right.  I'm here on behalf of the appellee. Your Honor, we have a case in front of you that the trial court spent an enormous amount of time deciding the issue of search. Counsel, I'm going to ask you to keep your voice up, please. It's a large room, as you know, and there are people in the back who I'm sure want to hear as well as we. I appreciate it. Thank you. What I was saying is the trial judge spent an enormous amount of time reviewing the objective evidence in this case that was presented by Mr. Barak on all issues. In fact, he said on the record that he had reviewed all 14,000 text messages that were over a period 2011 to 2012. There was not one text message that reflected any hostility between the parties, let alone the concept of divorce. So what do you say to Mr. Black about laying the proper foundation for those text messages and the authenticity of the text messages? As I think that your Justices have said, they were authenticated by Mr. Barak, and they were never contradicted by Mrs. Barak. She never got in the witness stand and said, no, those weren't my responses. Those weren't my text messages. The issue was never even brought up in a denial. They were heard. His cell phone number was established. Her cell phone number was established. The time, the dates, exactly what they said. And then the calendars, their social calendars for 2011 and 2013 were also in evidence. There's nothing there other than her subjective feeling to demonstrate the breakdown of the marriage, the inevitable breakdown of the marriage until January of 2014. There were so many issues. The issue of buying cemetery lots in January of 2013 and the lack of credibility that Judge Cerny found as it related to Mrs. Barak's statements. If you're going to get a divorce, you're not going to go with your husband to buy, in January of 2013, cemetery plots for the two of you and your family. It's just not going to happen. But there was a very tragic family death that may have led to something like that. So that may not be the strongest argument with respect to when that breakdown occurred or what was happening in their marriage because of the tragedy of losing a child. Well, the tragedy of losing a child, and I'm not disagreeing with that. I couldn't even fathom that. But they already had cemetery plots. Mrs. Barak wanted nicer cemetery plots. Their son, that wasn't really the issue at that time, respectfully. But we also had photographs during that period of time together. We had e-mails in the record from Mrs. Barak to Mr. Barak's family members inviting them on behalf of John and herself to their home for Christmas or for other holidays. She hosted birthday parties for Mr. Barak during this same time in 2012. And in response to the trust being written in 2011-12, the only reason for that essentially was because the federal government had increased the lifetime exemption from $1 million to $5 million. That's the nature of those trusts that were done in 2011-12. We have to keep in mind here, nine years before the filing was the first trusts that were signed by Mrs. Barak and Mr. Barak. Before they went to estate lawyers, they were already setting aside money for their children in custodial accounts, et cetera, in the 90s. But now Petitioner claims that your client made certain misrepresentations to get her to sign these trust documents, and the attorneys who drafted those documents acknowledge never having met with her. I mean, why don't those circumstances create a genuine issue of material fact as to whether there was a fraud on her marital rights? First of all, nobody suggested that she met with the attorneys. There's no obligation on the attorneys or on her to meet with them. She signed documents repeatedly year after year after year. I have records here that are attached to this motion for summary judgment where she's signing documents, not individually, but solely as trustee of the John P. LaRocque Family Trust. She's signing documents year after year. Janet M. LaRocque is beneficiary of a trust on behalf of the Grant LaRocque, a beneficiary of the trust, and on behalf of Emily LaRocque, a beneficiary of the trust. She suggests that she had no knowledge. She signed all these documents every year. She signed gift tax returns. Well, she indicates, I believe, in the record that she trusted her husband at that time. I'm sorry. Respectfully, I apologize if I interrupted. She never pointed out any misrepresentation by Mr. LaRocque. There were no misrepresentations. They were for the children. They were for tax planning. That's what he told her, for business. She had a duty when she signed all these trust agreements and transfers and all the gift tax returns, which she signed over and over again, to know what she's signing. The presumption is she knew what she was signing, or she could have done due diligence. Is there anything in the record that suggests that Mr. LaRocque didn't let her go see the lawyers or the lawyers refused to talk to her? There's no effort. It's beyond what happened with Mr. Johnson in Johnson v. LaGrange State, where he didn't want anything to do with his wife's trust. Why doesn't your client's history of borrowing substantial sums of money from these trusts, sometimes on the same day that he created the trust, create a genuine issue of material fact as to whether or not he retained control over the assets in those trusts? And thereby had a plan to deplete the marital estate. Because every loan was repaid with interest. And grantor trusts, which these are, allow for the exact thing that he did. It was to benefit their children and their heirs. And by creating these grantor trusts, they, again, on their joint income tax returns, were allowed to declare the income from these trusts. This is a normal estate plan. And they're irrevocable trusts. They're irrevocable. And there is absolutely no proof, no proof that Mr. LaRocque did not have donative intent and did anything, did anything to deal for himself. Grantor trusts are governed by the Internal Revenue Code. I have the section and all the provisions. He followed the law. He did not, nor did they ever prove that he ever did anything inconsistent with the trust or that the trustees did inconsistent conduct. We provided 4,500 pages of every transaction involving Mr. LaRocque with the trust, the promissory notes, the schedules for the payment of principal and interest. There is no self-dealing. He made an irrevocable gift. She made an irrevocable gift. That is Mrs. LaRocque. The basic trust, if I may, that Mrs. LaRocque set up and Mr. LaRocque set up all doubled the lifetime exemptions that went from $1 million to $5 million. They put a number. Oh, I'm sorry. But those trusts provided also that if there was a divorce, then she would not be a beneficiary any longer of a certain number of trusts. For his trust, for her trust. They both had the same amount of money on these trusts, and if there was a divorce, he was no longer a beneficiary of her trust. She was no longer the beneficiary of his trust. $5 million each. What was contributed to those trusts was about $11 million. The other million resulted from the Qualified Minors Trust that was established in 2005 by Mrs. LaRocque that was done by Campton Mutual, the same lawyers who did the other trusts. In that trust document, which is part of the record, she acknowledges that the parties had assets set aside for the children before the sophisticated estate plan that poured over into the Qualified Minors Trust prior to 2005. This was an estate plan that went on for nine years in the sophisticated way that Campton Mutual advised Mr. LaRocque. But before that, they were exercising their own rights insofar as providing for their children upon their death. Counsel argues that we erred in applying Johnson to the divorce setting in Romano in that it cuts against the legislative presumptions in the Act. Do you want to respond to that? Well, there is no such thing as marital property until there's a filing for divorce. Everybody in this courtroom knows it. The IMDMA doesn't suggest that there's any restrictions on a spouse's rights to deal with their property. This was Mr. LaRocque's property that he transferred into trusts or that Mrs. LaRocque transferred into her trusts. He had a natural right to do it. In Hoffman, another Supreme Court case, forgetting Kuczynski for a moment and LaGrange State Bank, they cite Johnson versus LaGrange Bank. If they were going to make a suggestion that it didn't apply in a marital situation, or if the property was determined to be marital thereafter, they could have done that. They didn't do it. There was no distinguishing of that. And respectfully, this Court didn't when they decided Romano. They didn't say, oh, this only relates, doesn't relate to divorce cases or only relates to one particular classification of property versus another because it doesn't. A party has a right to dispose of their property any way they want to do it. In fact, Johnson suggests that if it's not colorable or illusory, and by the way, both trial counsel and Mr. Black in their briefs and in their statements admitted that these were valid trusts. They were valid trusts. So what's their argument? They have no facts to support anything they're saying. There's nothing in the record to support any of the allegations that are in her response. And when you look at her affidavit, she's saying, oh, my God, I didn't know what I was signing. Well, the law is clear. After nine years of signing documents under the name of being a trustee or a beneficiary trustee for a grantor and signing gift tax returns regarding home, I think the presumption has been well met that she knew what she was doing contrary to what her affidavit said. Or the presumption is she should have known she had the right to due diligence. There was nothing done untoward by Mr. Black or anybody affiliated with him that would have prevented Mrs. Black if she really wanted to spend the time and effort to understand each and every document that she signed. Mr. Berger, I'm going to ask you to comment, if you will, because I anticipate Mr. Black will spend a couple minutes in his reply on the sanctions order since he did not do that during his opening argument. Do you want to briefly comment on the sanctions order? And at this point, I know you can't respond specifically to an argument because we haven't heard it. The sanctions motions were presented by us on behalf of Mrs. LaRock because of the conduct of Mrs. LaRock's attorneys in pursuing her, we'll call her rights. They miscited law. They cited the, and what was said in Mr. Black's brief, respectfully, is not accurate. What they did was they cited the appellate court case in Johnson instead of the Supreme Court case and then they went on so far as to say not just a mistake in a cite as put in the brief, they went on to say to the court that this appellate court decision was reversed by the Supreme Court on other grounds. That wasn't true at all. Then they misrepresented the trust statute. They put part of the trust statute in, but they didn't put the balance in. So that justifies $50,000?  Okay. What happened was we were set for hearing and we brought our records and our proof of all the time that we spent specifically on the issues that we believed sanctions should have been entered. And it came to about $150,000 plus of time that was expended because of their frivolous and sanctionable motions regarding discovery as well as the motion for summary judgment. There was never an objection at that hearing to how the hearing was conducted. We were there for an evidentiary hearing. We brought our records. So you're saying it's forfeited here? Yes. Many of the arguments they've made are forfeited here. They were brought up in this brief. They were never in the record in the lower court. Many. I won't get into them because you're not asking me. But what I'm saying to your honors is that we reflected the $150,000 plus. It was under 137 and 508 for unnecessary litigious conduct. That was in your motion? Yes, it was. So those two provisions. Although in their brief, they don't say that, but it's there all over the place. I don't know why it's not in their brief in this honorable court. Well, we have the record, counsel. But the nature of what Mr. Rosenfeld did was outrageous. Well, rather than your editorial comments, I'm going to ask you more specifically. Sure. In what specific pleading or pleadings did Mr. Rosenfeld supposedly falsely claim that your client had failed to produce documents with it? Was there a specific pleading? Multiple motions, your honor. Multiple motions. Well, can you pinpoint the one or not? I could. One of my colleagues can give it to me and I can provide it to you. But they are in the record. And what he did in front of Judge Cerny was accuse us, our firm, of making up bait stamps, making up false receipts for things that went to his office. And Judge Cerny said, you know, this is pretty serious. You know, if you're not able to prove this, you know, there's a problem going to happen here. Okay. Okay. Thank you very much, counsel. Thank you. During a hearing in February, I believe it was 2017, there was an issue concerning bait stamp documents that was raised. Mr. Rosenfeld raised that they believed that they did not get all of the documents fully bait stamped. Mr. Rosenfeld said that their accountants went through these and said they were not fully bait stamped. There was a disagreement during that hearing. And the judge said... Excuse me, was the issue that they received the documents but they weren't bait stamped or that they hadn't received the documents? Mr. Rosenfeld felt that because the accountants said that they... And I'm trying to clarify here. The bottom line was that Mr. Rosenfeld felt upon advice of the accountants that they were not there in the bait stamped documents. All the documents weren't there because the bait stamp numbers were off. Correct. As it turns out, the accountants were wrong. Mr. Rosenfeld, through his firm, advised the court at the next hearing, of this mistake, apologized to the court, and that is the nature of this aspect of the discovery sanction. In the interim then, did the husband's firm have to go back and reproduce some of the discovery that Mr. Rosenfeld Klenke did not have, when in fact he had? Not that I see from the record. The whole aspect of this... Well, there was a second hearing date.  At which those documents were then brought back. The trial court said that I am sanctioning you for the time we spent that afternoon. We spent hours on it this afternoon, when we were arguing about whether or not all the documents were put together. They came back, and it was reported to the court that we made a mistake. Our accountants misinformed us. And that's on us. And there we go. When the trial court set $50,000 as the sanction, did Mr. Rosenfeld object or file a motion to reconsider, contesting that amount as being arbitrary? I don't recall there being a motion to reconsider. I also don't recall that there was any sort of submission that would justify any amount, let alone an amount for $50,000. So there was a submission of $150,000. I think it related, if I'm not mistaken, only to their alleged costs and... In terms of summary judgment. Regarding summary judgment. That is correct. There was no submission as to the discovery. There was as to the summary judgment. But the $50,000 was the whole ball of wax. It was, according to the court, it was for both. We're of the position, obviously, and part of my argument in terms of what the summary judgment, substantive issue on the summary judgment, also dovetails into the fact that there shouldn't be a sanction for responding to the summary judgment. But for her to have raised, through her attorney, a good faith argument that the transfers to these trusts were either colorable or illusory or without any donative intent, wouldn't she have had to produce an expert, like in the Romano case? Wasn't it a frivolous argument without an expert for her to attack these trusts? Again, we don't believe so, Your Honor, because of the surrounding facts, because of the fact that she did not meet with these attorneys. She did not know what was going on. I hear, I've heard in the argument, in response to our argument, that this was Mr. LaRock's property that he transferred into the trust. That's a very broad statement. Well, it was her property, too. Exactly. At the time, there was no divorce proceeding pending. It was each of their properties. Exactly. So this premise for everything else that flows out of this is disturbing. That leads to everything else that was done here. I hear her talk about this is his, you know, marital property versus property interests and all well and good, and I guess this kind of, we're sitting in a situation here where Romano says, you can do what you want with your property, and they're saying this is his property when it's their property, and I can do what I want with it, and it's never going to be dissipation if I do it before there's an irretrievable breakdown, but I can still make loans to myself with it. So what do we call that? Is it depletion? What are we doing with that? It wasn't loans to himself. It was loans. Loans for his business that he had access to. Wouldn't she have had access to the same thing, and she could have paid it back with interest as well? I don't specifically know the answer to that question. I don't know the answer. Well, she had several of those grantor trusts in her name that she could have borrowed off of. No. Correct? I don't know the answer to that. I can't. I'm not going to answer a question I don't specifically know the answer to, Your Honor. That would be irresponsible. Thank you. I have nothing further. Thank you, Your Honor. Thank you. Thank you very much, Counsel. The Court will take the matter under advisement and render a decision in due course. We stand in recess until the next case.